# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————  )
                                              )
VERONICA FINDLAY,                             )
                                              )
                    Plaintiff,                )
                                              )
                                              )
        v.                                    )        Civil Action No. 10-2091 (RBW)
                                              )
                                              )
CITIMORTGAGE, INC., et al.,                   )
                                              )
                    Defendants.               )
                                              )
———————————————————————  )

## <u>MEMORANDUM OPINION</u>

Veronica Findlay, the plaintiff in this civil action, seeks damages and declaratory relief under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 (2006), the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2601 (2006), the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code § 28-3901 (2007), and District of Columbia common law for harms allegedly incurred as a result of the defendants' "abusive mortgage refinancing practices."  <u>See</u> Complaint ("Compl.") ¶¶ 3-8, 191-98.  Currently before the Court is defendant CitiMortgage, Inc.'s motion to dismiss.  After carefully considering the Complaint, the defendant's motion, and all memoranda of law relating to that motion,[1] the Court concludes for the following reasons that it must grant in part and deny in part the defendant's motion to dismiss.

---

[1] In addition to the Complaint and the defendant's motion to dismiss, the Court considered the following submissions in rendering its decision: (1) Memorandum of Points and Authorities in Support of Defendant CitiMortgage, Inc.'s Motion to Dismiss ("Def.'s Mem."); (2) Plaintiff's Opposition to Defendant CitiMortgage, Inc.'s Motion to Dismiss ("Pl.'s Opp'n"); and (3) Defendant CitiMortgage, Inc.'s Reply in Response to Plaintiff's Opposition to Motion to Dismiss ("Def.'s Reply").

## I.  BACKGROUND

The plaintiff purchased her home, located at 1330 T Street, S.E. in Washington D.C. (the "Property"), in 1988.  Compl. ¶ 37.  She refinanced her mortgage nineteen years later in January 2007, with the assistance of defendant Thomas Cardwell, a mortgage broker.  Id. ¶¶ 42-43. Upon closing the loan, she obtained "an Indymac adjustable rate mortgage in the amount of $264,000," id. ¶ 43, and "a cash payment from the Indymac refinance transaction," which she used to make her monthly mortgage payments, id. ¶ 45.

In October 2007, the plaintiff again sought to refinance her mortgage with Mr. Cardwell's assistance, this time hoping to obtain a lower monthly payment and a fixed rate mortgage.  Id. ¶ 46.  The plaintiff alleges that Mr. Cardwell led her to believe that she would receive both a lower monthly payment and a fixed rate mortgage, and that, relying on these representations, the plaintiff agreed to refinance her mortgage loan on the terms promised by Mr. Cardwell.  Id. With Mr. Cardwell and defendant Aapex Financial Group, Inc. ("Aapex") serving as the loan originators and CitiMortgage as the lender, the plaintiff closed on the loan on October 8, 2007 ("October 2007 loan").  Id. ¶¶ 47, 53.  The October 2007 loan had a principal indebtedness of $323,000.  Id. ¶ 54.  The plaintiff received a cash payment for the refinancing of the Property in the amount of $35,616, and, once again, she used the payment to make her monthly mortgage payments.  Id. ¶ 56.

The plaintiff makes several allegations of impropriety concerning the October 2007 loan which serve as the basis for this litigation.  See id. ¶¶ 48-100.  She first alleges that the terms of the October 2007 loan did not comport with Mr. Cardwell's representations.  Id. ¶¶ 4-5, 54-55. Her monthly mortgage payments, for instance, did not decrease as Mr. Cardwell had allegedly promised, but increased from $1,880 to $2,061 per month, with the principal increasing as well from $264,000 to $323,000.  Id.  And instead of the fixed rate mortgage she desired, the October

2007 loan was a "complex mortgage product with a hybrid adjustable rate mortgage, known as an 'exploding' ARM." Id. ¶ 4. The Complaint asserts that this type of loan was "unsuitable" for the plaintiff, who is "a disabled senior on a fixed income." Id. Second, the plaintiff claims that the agent conducting the closing failed to, among other things, "ask [the plaintiff] for identification," id. ¶ 60, "administer an oath to [the plaintiff]," id. ¶ 61, or "notarize [the plaintiff's] signature in her presence," id. ¶ 62. Third, the plaintiff contends that she was charged unjustified fees—totaling over $20,000—in connection with the closing. Id. ¶ 67. Fourth, the plaintiff asserts that "CitiMortgage did not clearly and accurately disclose the [f]inance [c]harges" associated with the loan. Id. ¶ 74. She further claims that CitiMortgage failed to deliver the required loan documents at the closing, that the Truth in Lending disclosures that CitiMortgage did deliver were incorrect, and that she did not receive two copies of her Notice of the Right to Cancel as required by the TILA. Id. ¶¶ 87-94.

At some point in 2010, the plaintiff defaulted on her loan and was unable to obtain a loan modification from CitiMortgage. See id. ¶ 98; Def.'s Mem. at. 3. CitiMortgage thereafter initiated a foreclosure action against the plaintiff by sending her a Notice of Foreclosure on June 23, 2010. Compl. ¶ 99. In August 2010, the servicing of the plaintiff's October 2007 loan was transferred from CitiMortgage to Acqura Loan Services ("Acqura"). Id. ¶ 100. According to the Complaint, "the transfer did not affect the terms or condition of [the plaintiff's] loan documents other than the terms directly related to the servicing of her loan." Id. On October 4, 2010, the plaintiff sent a Notice of Rescission to CitiMortgage and Acqura, a copy of which is attached as Exhibit A to the Complaint. See id., Exhibit A (October 4, 2010 Loan Rescission Notice). The Notice claims a right to rescind the October 2007 loan based on CitiMortgage's purported failure to provide "material disclosures" required by the TILA. Id.

On October 6, 2010, the plaintiff instituted this action in the Superior Court of the District of Columbia.  Her Complaint contains ten counts, seven of which are asserted against CitiMortgage.  Those counts include Count II (for violations of the CPPA), Compl. ¶¶ 121-25; Count III (also for violations of the CPPA), id. ¶¶ 126-35; Count IV (for negligence), id. ¶¶ 136-44; Count VI (for violations of the TILA), id. ¶¶ 158-83; Count VIII (for violations of the RESPA), id. ¶¶ 191-98; Count IX (for civil conspiracy), id ¶¶ 199-204; and Count X (for joint venture), id. ¶¶ 205-11.  The Plaintiff seeks actual damages, treble damages, attorneys' fees, reasonable costs, equitable relief, a declaratory judgment entitling her to rescind the mortgage pursuant to the TILA, and an equitable modification of her "right to tender."  Id. at 29-30.  She also requests punitive damages as part of her negligence claim.  Id. ¶ 144.

CitiMortgage removed the case to this Court on December 9, 2010, and, on December 30, 2010, moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  In support of its motion, CitiMortgage asserts the following grounds for dismissal of the Complaint: (1) the plaintiff's TILA claim for damages is time-barred, Def.'s Mem. at 4-5; (2) the Complaint fails to state a claim for rescission under the TILA because the plaintiff fails to allege the ability to tender the amounts borrowed, id. at 5-8; (3) the plaintiff's RESPA claims are time-barred, id. at 8; (4) the plaintiff's CCPA claims fail as a matter of law, id. at 8-11; (5) the plaintiff's negligence claim fails as a matter of law, id. at 11-12; (6) the Complaint fails to state a claim for civil conspiracy; id. at 13-14; (7) the Complaint fails to state a claim for joint venture, id. at 14-15; and (8) the Complaint fails to demonstrate entitlement to an award of punitive damages, id. at 15-16.  The plaintiff has responded in opposition to the defendant's motion, disputing each ground for dismissal asserted therein.  See generally Pl.'s Opp'n.

## II.  STANDARD OF REVIEW

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint properly states a claim on which relief may be granted."  Davis v. Billington, 775 F. Supp. 2d 23, 32 (D.D.C. 2011).  For a complaint to survive a Rule 12(b)(6) motion, Federal Rule of Civil Procedure 8(a) requires only that it provide a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Although "detailed factual allegations" are not required, a plaintiff must provide "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," Ashcroft v. Iqbal, ____ U.S. ____, ____, 129 S. Ct. 1937, 1949 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–57 (2007)), in order to "give the defendant fair notice . . . of what the claim is and the grounds upon which it rests," Twombly, 550 U.S. at 555 (citation omitted).  Nor may a plaintiff offer mere "labels and conclusions . . . [or] a formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 555.  Rather, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 129 S. Ct. at 1949 (quoting Twombly, 550 U.S. at 570).

A claim is facially plausible "'when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged.'"  Id. (quoting Twombly, 550 U.S. at 556).  "A complaint alleging facts which are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief."  Id. (citing Twombly, 550 U.S. at 557) (internal quotation marks omitted).

In evaluating a Rule 12(b)(6) motion, the complaint must be liberally construed in the plaintiff's favor and all well-pleaded factual allegations must be accepted as true.  Davis, 775 F. Supp. 2d at 32-33.  But while the Court must accept well-pleaded factual allegations, any

conclusory allegations are not entitled to an assumption of truth, and even those allegations pleaded with factual support need only be accepted insofar as "they plausibly give rise to an entitlement to relief."  Iqbal, 129 S. Ct. at 1950.

## III.  LEGAL ANALYSIS

### A.      Count VI: TILA Claims

#### 1.      Statute of Limitations Challenge to Damages Under the TILA

Count VI of the Complaint seeks damages under the TILA for, among other things, the defendant's alleged failure to deliver "material disclosures" required by the TILA and for the defendant's delivery of "materially inaccurate" disclosure statements.  Compl. ¶¶ 168-77.  The defendant contends that the applicable statute of limitations for TILA damages claims is one year, which begins to run "from the date the transaction is consummated."  Def.'s Mem. 4-5.  Noting that the plaintiff's loan was consummated at the closing held on October 8, 2007, see Compl. ¶ 53, and that the plaintiff filed suit nearly three years later on October 6, 2010, the defendant maintains that her TILA damages claim is time-barred, Def.'s Mem. at 5.  For the reasons that follow, the Court agrees.

Under §1640(e) of the TILA, claims for damages must be brought "within one year from the date of the occurrence of the violation."[2]  15 U.S.C. § 1640(e).  "In closed-end consumer credit transactions, such as the one in this case, the [TILA's] limitations period begins to run on the date of settlement."  Johnson v. Long Beach Mortg. Loan Trust, 2001-4, 451 F. Supp. 2d 16, 39 (D.D.C. 2006) (citing Postow v. OBA Fed. Sav. & Loan Assoc., 627 F.2d 1370, 1380 (D.C. Cir. 1980)).  Here, the settlement for the plaintiff's loan occurred, and the limitations period began to run, on October 8, 2007.  See Compl. ¶ 53.  Yet the plaintiff did not file this action until

---

[2] TILA claims for rescission, by contrast, are subject to a three year statute of limitations.  See 15 U.S.C.§ 1635(f ) ("An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first").

October 6, 2010, nearly three years after the settlement and well outside the one-year period mandated by § 1640(e).

While acknowledging that she filed suit more than year after the settlement, the plaintiff nonetheless seeks to invoke the "recoupment" exception to the TILA's one-year limitations period. Pl.'s Opp'n at 17-18. That exception provides as follows: "This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action." 15 U.S.C. § 1640(e) (emphasis added). The plaintiff maintains that she "brought [this] action as a defensive measure, specifically as a defense to the foreclosure initiated by CitiMortgage" and that she is therefore permitted to "assert a recoupment or set-off claim in defense to the foreclosure beyond the limitations period." Pl.'s Opp'n at 19. Although the plaintiff may have filed suit in response to the defendants' foreclosure efforts, she has not asserted a TILA claim "as a matter of defense" in "an action to collect the debt" brought by a lender against a debtor. Rather, she has brought an affirmative TILA claim for damages against the defendant-lender in a lawsuit she initiated, and the recoupment exception thus is inapplicable. See Moor v. Travelers Ins. Co., 784 F.2d 632, 634 (5th Cir. 1986) ("When the debtor hales the creditor into court, as Moor has done in this case, the claim by the debtor is affirmative rather than defensive. As such, it is subject to the one- . . . year limitations provisions" of the TILA); Johnson, 451 F. Supp. 2d at 39 (rejecting recoupment defense and dismissing claim as time-barred where debtor brought affirmative TILA claim against lender); Van Pier v. Long Island Sav. Bank, 20 F. Supp. 2d 535, 536 (S.D.N.Y. 1998) ("plaintiff argues that his TILA claim in effect constitutes assertion of a defense of recoupment to the foreclosure sale initiated by defendants, and therefore is not within the one-year limitations period. Under the plain language of the statute, however, this argument is unavailing, because here plaintiff

asserts his TILA claim affirmatively, in an action for damages that he himself commenced, and

not as a defense 'in an action to collect the debt.'"); see also Beach v. Ocwen Fed. Bank, 523 U.S.

410, 412 (1998) (noting that, under § 1640(e), "a borrower may assert the right to damages 'as a

matter of defense by recoupment or set-off' in a collection action brought by the lender even after

the one year is up." (emphasis added)).[3]  The Court, accordingly, concludes that the plaintiff's

TILA damages claim is time-barred under § 1640(e)'s one-year limitations period as discerned

from the face of the Complaint and that the claim must be dismissed with prejudice.

### 2.      Rescission Under the TILA and the Plaintiff's Ability to Tender Loan Amount

In addition to seeking damages, Count VI of the Complaint asserts a right to rescind the

mortgage loan based upon the defendants' alleged TILA violations.  Compl. ¶ 178.  The

defendant argues that, in order to state a claim for rescission under the TILA, the plaintiff must

allege an ability to tender the principal loan amount back to the defendant, which the defendant

claims the plaintiff is unable to do.  Def.'s Mem. at  5.  The plaintiff responds that neither the

TILA nor the law of this Circuit requires a plaintiff to plead an ability to tender the principal loan

amount in support of a rescission claim.  Pl.'s Opp'n at 12.

Section 1635(b) of the TILA establishes the following framework for exercising the right

of rescission:

> When an obligor exercises his right to rescind under subsection (a) of this section,
> he is not liable for any finance or other charge, and any security interest given by
> the obligor, including any such interest arising by operation of law, becomes void
> upon such a rescission.  Within 20 days after receipt of a notice of rescission, the
> creditor shall return to the obligor any money or property given as earnest money,
> downpayment, or otherwise, and shall take any action necessary or appropriate to
> reflect the termination of any security interest created under the transaction.  If the
> creditor  has  delivered  any  property  to  the  obligor,  the  obligor  may  retain

---

[3] The plaintiff cites two cases wherein courts permitted defensive claims of usury and fraud even though the claims
would have been time-barred if brought affirmatively.  See In re Bishop, 79 B.R. 94, 96 (Bankr. D.D.C. 1987)
(permitting defensive usury claim beyond statute of limitations); King v. Kitchen Magic, Inc., 391 A.2d 1184, 1187
(D.C. 1978)  (permitting defensive fraud claim beyond statute of limitations).  Setting aside the merits of these
cases, they do not concern the TILA's limitations period for damages claims and thus are inapposite.

possession of it.  Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.  Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor.  If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.  The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b).  To be sure, the text of the TILA does not require a plaintiff to demonstrate an ability to tender the principal loan amount before exercising the right of rescission.  But that does not end the Court's inquiry, for the right to rescind, though "statutorily granted" by the TILA, "remains an equitable doctrine subject to equitable considerations."  Brown v. Nat'l Permanent Fed. Sav. & Loan Assoc., 683 F.2d 444, 447 (D.C. Cir. 1982) (per curiam).  For instance, district courts have "the equitable power to condition rescission upon the return of the loan proceeds by [the plaintiff]."  Id. at 449.

Yet, the fact that district courts have discretion to condition rescission upon return of the principal does not mean that a plaintiff is required, as the defendant suggests, to allege in her complaint an ability to tender the loan amount in order to state a claim for rescission.  Such a pleading requirement would conflict with the sequence of rescission procedures outlined in the TILA, under which the lender, not the debtor, must tender first.  See 15 U.S.C. § 1635(b) ("Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise . . . . Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor").  Consistent with this reasoning, another member of this Court has concluded that there is no ability-to-tender pleading requirement under the TILA:

Several courts have held that a rescission claim should be dismissed (with leave to amend) for failure to allege an ability to tender the principal to the creditor.  See, e.g., Montoya v. Countrywide Bank, F.S.B., No. C09-00641, 2009 WL 1813973,

at *5 (N.D. Cal. June 25, 2009).  However, this Court is not persuaded that ability to tender is a pleading requirement for a TILA rescission claim.  As the D.C. Circuit noted in <u>Brown v. National Permanent Federal Savings and Loan Association</u>, 683 F.2d 444 (D.C. Cir. 1982) (per curiam), § 1635(b) does not require that a debtor tender first; it is the creditor that must tender before the borrower's obligation arises.  <u>Id.</u> at 447.  Because the statute states that the security interest becomes void once the right to rescind is exercised, a rescission claimant should not be required to plead an ability to tender the property to the creditor.  Moreover, several courts have recognized that inability to tender is a factual question more appropriate for resolution on summary judgment.  <u>See, e.g.</u>, <u>Moore v. Wells Fargo Bank, N.A.</u>, 597 F. Supp. 2d 612, 616-17 (E.D. Va. 2009).

Courts are, however, free to exercise equitable discretion to modify rescission procedures, and rescission under TILA may be conditioned on the debtor's return of any money received.  <u>Id.</u>; 15 U.S.C. § 1635(b).  Although the Court finds that it is not appropriate to modify the rescission procedure at the motion to dismiss stage, it may require Plaintiffs to prove an ability to tender the principal balance before ordering rescission.

<u>Freese v. Empire Fin. Servs.</u>, 725 F. Supp. 2d 130, 138 (D.D.C. 2010) (Kollar-Kotelly, J.).  This member of the Court agrees with the rationale of <u>Freese</u> and finds that, while it may eventually be necessary for the Court to exercise its equitable power to condition rescission upon the plaintiff's ability to tender the principal, the plaintiff is by no means required to plead her ability to tender the loan amount in order to survive a motion to dismiss.  Furthermore, given its fact-specific nature, the determination of the plaintiff's ability to pay the principal would, as noted in <u>Freese</u>, be more appropriately addressed at the summary judgment stage.

The Court's conclusion is not at odds with the case upon which the defendant principally relies, <u>American Mortgage Network, Inc., v. Shelton</u>, 486 F.3d 815 (4th Cir. 2007).  There, the Fourth Circuit "adopt[ed] the majority view of reviewing courts that unilateral notification of cancellation does not automatically void the loan contract."  <u>Id.</u> at 821.  The court reasoned that "'[t]he natural reading of § 1653(b) is that the security interest becomes void when the obligor exercises a right to rescind that is available in the particular case, either because the creditor acknowledges that the right of rescission is available, or because the appropriate decision maker

[, e.g., a court,] has so determined . . . . Until such decision is made, the [borrowers] have only advanced <u>a claim seeking rescission</u>." <u>Id.</u> (quoting <u>Large v. Conseco Fin. Servicing Corp.</u>, 292 F.3d 49, 54-55 (1st Cir. 2002)) (emphasis added).   Applying this principle, the court in <u>Shelton</u> upheld the district court's denial of the remedy of "unconditional rescission" because the debtors "admitted" they were "unable to tender the loan proceeds."   <u>Id.</u>   Here, the Court is neither declaring the plaintiff's mortgage loan "automatically void" based upon her unilateral rescission notice, nor is it providing the remedy of "unconditional rescission"—it is only finding that the plaintiff was not required to plead her ability to tender in the Complaint.   The issue may, as already noted, be raised at later stages of the litigation.   Thus, the defendants' motion to dismiss the plaintiff's TILA rescission claim must be denied.

## B.   Count VIII: RESPA Claim

Count VIII of the Complaint seeks monetary damages for alleged violations of the RESPA pursuant to 12 U.S.C. § 2607.  Compl. ¶¶ 191-98.  In moving for dismissal, the defendants contend that this claim, like the plaintiff's TILA damages claim, is time-barred. Def.'s Mem. at 8.  The statute of limitations for RESPA claims brought under § 2607 is one year. <u>See</u> 12 U.S.C. § 2614 ("Any action pursuant to the provisions of section . . . 2607 . . . of this title may be brought . . . within . . . 1 year in the case of a violation of section 2607 or 2608 of this title from the date of the occurrence of the violation.").  "The 'date of the occurrence' language in § 2614 refers to the date of the closing." <u>Chen v. Bell-Smith</u>, 768 F. Supp. 2d 121, 149 (D.D.C. 2011) (citing <u>Snow v. First Am. Title Ins. Co.</u>, 332 F.3d 356, 359 (5th Cir. 2003) and <u>Palmer v. Homecomings Fin., LLC</u>, 677 F. Supp. 2d 233, 237-38 (D.D.C. 2010)).  As previously noted, the closing in this case took place on October 8, 2007, Compl. ¶ 53, and the plaintiff did not file suit until October 6, 2010.  The plaintiff's RESPA claim is, therefore, time-barred as discerned from the face of the Complaint.

The plaintiff again maintains, as she did in opposition to dismissal of her TILA damages claim, that her RESPA claim is not time-barred because it is "defensive in nature" and is asserted "by way of recoupment in response to CitiMortgage's Notice of Foreclosure."  Pl.'s Opp'n at 20. This argument is even weaker in the RESPA context because, as the plaintiff admits, the "RESPA does not have an explicit [recoupment] provision as [the] TILA does."  Id.  Needless to say, the plaintiff cites no authority permitting the assertion of an otherwise time-barred RESPA claim as a defensive measure by way of recoupment.  Even assuming such an exception existed, the plaintiff's RESPA claim, like her TILA damages claim, is asserted not as a defensive measure but as an affirmative claim in a lawsuit that she initiated.  Accordingly, the Court rejects the plaintiff's argument and dismisses the RESPA claim as time-barred with prejudice.

## C.      Counts II and III: CCPA Claims for Unconscionability

Count III of the complaint alleges that the defendant's mortgage refinancing practices were unconscionable under the CPPA.  Compl. ¶¶ 126-35.  The defendant maintains that the allegations in Count III cannot withstand a motion to dismiss because they are nothing more than conclusory lists of elements of claims without factual support.  Def.'s Mem. at 10-11 (citing Iqbal, 129 S. Ct. at 1949).  The plaintiff of course responds that she has adequately pleaded violations of the CPPA in accordance with the law of this Circuit.  Pl.'s Opp'n at 22.

Section § 28-3904 of the CPPA provides in pertinent part as follows:

It shall be a violation of this chapter, whether or not any consumer is in fact misled, deceived or damaged thereby, for any person to:

* * * *

(r) make or enforce unconscionable terms or provisions of sales or leases; in applying this subsection, consideration shall be given to the following, and other factors:

(1) knowledge by the person at the time credit sales are consummated that there was no reasonable probability of payment in full of the obligation by the consumer;

* * * *

   (2) knowledge by the person at the time of the sale or lease of the inability of the consumer to receive substantial benefits from the property or services sold or leased;

* * * *

   (5) that the person has knowingly taken advantage of the inability of the consumer reasonably to protect his interests by reasons of age, physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors.

D.C. Code § 28-3904(r)(1), (2), & (5). As the statute indicates, subsections (1) through (5) are merely factors to consider in determining whether the terms or provisions of sales or leases are unconscionable, see id., so a plaintiff is not required to satisfy each subsection in order to state a claim for unconscionability under the CPPA. Regarding the statute's applicability in this case, the District of Columbia Court of Appeals has made clear that "§ 28-3904(r) applies to real estate mortgage finance transactions." DeBerry v. First Gov't Mortg. & Investors Corp., 743 A.2d 699, 703 (D.C. 1999).

   The plaintiff alleges that the defendant violated subsection (r)(1) of § 28-3904 when it "made, funded, and/or securitized loans to [the plaintiff] that were unsuitable, unaffordable, and unconscionable, and which were made with knowledge that there was no reasonable expectation that she would be able to repay the loan as structured," and that "[d]uring the underwriting process, [the defendant] knew or should have known that based on [the plaintiff's] income and monthly expenses that the loan to her was unaffordable and unsuitable." Compl. ¶ 130. The plaintiff further claims that the defendant violated subsection (r)(5) by "knowingly taking advantage of [her] inability to protect her own interests by reason of her disability, age, ignorance, lack of sophistication, and other factors, in extending her a loan product which was

unconscionable, unsuitable, and unaffordable." Id. ¶ 132.  As factual support for these

assertions, the plaintiff alleges that she has a sixth grade education, has been disabled since 1998,

has a total monthly income of $853 from Social Security disability benefits (i.e., far less than

half of her alleged $2,061 monthly mortgage payment), and that she provided proof of her

monthly income when she obtained her loan.  Id. ¶¶ 39-41, 51, 55.

Similar claims of unconscionability under the CPPA have been sustained in this Circuit.

See, e.g., Williams v. First Gov't Mort. & Invest. Corp., 225 F.3d 738, 744 (D.C. Cir. 2000)

(upholding jury verdict that home refinancing lender violated CPPA by making loan to borrower

who the lender either knew would be unable to repay or by taking advantage of borrower's

inability to protect his own interests, where evidence showed that borrower was 61 years old and

retired due to disability, the monthly loan payment was more than half the borrower's monthly

income, borrower had only a sixth grade education, and loan officer did not explain loan

documents to borrower); Hughes v. Abell, ____ F. Supp. 2d ____, ____, 2010 WL 4630227, at

*5 (D.D.C. 2010) (denying motion to dismiss CPPA claim brought under § 28-3904(r)(1) where

plaintiff alleged that lender was aware that terms of loan required nearly half of his income and

that the plaintiff had no prospects for increased income); Johnson, 451 F. Supp. 2d at 38

(denying motion to dismiss CPPA claim brought under § 28-3904(r)(1) and (2) where the

plaintiff alleged that his monthly loan payment was more than half of his income and that he was

elderly, had limited education, limited ability to comprehend the nature of the loans, limited

economic resources, and lacked business sophistication).

The defendant tries to distinguish these cases by emphasizing that the plaintiff had

obtained a prior refinance loan with Indymac nine months before her loan with the defendant

where she agreed to pay a monthly mortgage payment $1,000 in excess of her income.  Def.'s

Reply at 9; Compl. ¶¶ 44-45.  The Court does not discern what relevance the defendant is

according to this prior transaction, but, if anything, it bolsters the plaintiff's position that she is an unsophisticated consumer who did not fully understand her loan terms.  Indeed, the supposed reason why the plaintiff sought to refinance with the defendant in the first place was because she "wanted a lower monthly mortgage payment," Compl. ¶ 46, thus indicating that she did not appreciate the Indymac loan terms until months after she consummated the transaction.  And the alleged fact that she believed the loan with the defendant would lower her monthly payment, when it purportedly raised the payment, id. ¶¶ 46, 55, further supports her claim that she was an unsophisticated borrower.

The plaintiff also asserts that the defendant violated subsection (r)(2) of § 28-3904 "by refinancing [her] mortgage loan without providing her substantial benefits and instead extending a loan product that was unconscionable, unsuitable, and unaffordable."  Compl. ¶ 131.  According to the Complaint, "the refinance worked to [the plaintiff's] substantial detriment . . . , causing her to pay some combination of substantial costs and fees."  Id.  The defendant maintains that, contrary to these allegations, the plaintiff did receive a benefit in the form of the "'cash-out payment of approximately $35,616 from the refinance.'"  Def.'s Reply at 9 (quoting Compl. ¶ 56).  However, the Complaint alleges that the plaintiff's monthly mortgage payments and principal increased significantly under the terms of the defendant's loan, Compl. ¶¶ 54-55, arguably off-setting any temporary benefit gained by the defendant's up-front cash payment.  Given the gross disparity between the plaintiff's loan indebtedness and her monthly income, of which the defendant was allegedly aware, one could infer knowledge on the defendant's part "of the inability of the consumer to receive substantial benefits from the property or services sold or leased," D.C. Code § 28-3904(r)(2).

In sum, the Court is satisfied that the plaintiff's allegations, when viewed in the light most favorable to her, give rise to a plausible claim to relief under subsections (r)(1), (r)(2), and (r)(5) of D.C. Code § 28-3904.  The defendant's motion to dismiss Count III is therefore denied.

The defendant has also moved to dismiss Count II of the Complaint, which alleges in part that several of the defendants violated § 28-3904(r)(2) by "charging [the plaintiff] with . . . high closing costs and finance[] charges without providing [the plaintiff] with substantial benefits," Compl. ¶ 124, including an "outrageous loan discount to [Aapex] of $10,720, which was 3.3% of the total value of the refinance; and the outrageous application fee payable to Mortgage Empowerment which was almost 1% the total value of the refinance, $3,200," id. ¶ 123.  The defendant maintains that these factual allegations "do not state what specific acts each defendant committed in violation of the Act," and that none of the allegations concerning the negotiation and closing of the October 2007 loan implicate CitiMortgage in particular.  Def.'s Mem. at 9.  While Count II does not clarify which defendant assessed the charges to the plaintiff, a liberal construction of the Complaint suggests that CitiMortgage had some involvement in overcharging the plaintiff in violation of § 28-3904(r)(2).  See Compl. ¶ 67 (alleging that the plaintiff "paid over $20,000 in fees and costs to settle the CitiMortgage loan"); id. ¶ 70 (alleging that the settlement fees included a $550 "commitment fee" to CitiMortgage and a $10,720.37 charge for a payment made by CitiMortgage).  Having found that Count II adequately alleges that the defendant violated at least one subsection of § 28-3904(r), the Court declines to dismiss Count II for failure to state a claim.

## D.    Count IV: Negligence

Count IV of the Complaint asserts a negligence claim against the defendant.  Compl. ¶¶ 136-44.  In moving to dismiss this claim, the defendant contends that the plaintiff has failed to adequately allege that it owed a legal duty to the plaintiff.  Def.'s Mem. at 12.  The plaintiff

responds that she has identified several applicable duties, including a mortgage lender's duty of care to borrowers, a duty arising by virtue of a statute, and a lender's duty of care to avoid dealing with brokers who violate industry standards.  Pl.'s Opp'n at 28-30.

To establish a negligence claim, a plaintiff must show "(1) a duty, owed by the defendant to the plaintiff, to conform to a certain standard of care; (2) a breach of this duty by the defendant; and (3) an injury to the plaintiff proximately caused by the defendant's breach." District of Columbia v. Fowler, 497 A.2d 456, 463 n.13 (D.C. 1985).  Whether a duty exists is a question of law for the Court.  Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 793 (D.C. 2011).  Making this determination is "essentially a question of whether the policy of the law will extend the responsibility for the conduct to the consequences which have in fact occurred."  Id. (internal quotation marks and citation omitted).

The relationship between a debtor and creditor is ordinarily a contractual one, lacking any fiduciary duties.  See Geiger v. Crestar Bank, 778 A.2d 1085, 1091 (D.C. 2001).  Nevertheless, as the plaintiff notes, "'mortgage lenders may owe a duty of care to borrowers'" under certain circumstances.  Pl.'s Opp'n at 28 (quoting Hughes, 2010 WL 4630227, at *7).  In Hughes, for example, another member of this Court held that the plaintiff adequately pleaded a negligence claim against a mortgage lender based on allegations that "he paid $10,127.32 in closing costs to obtain the loan from the defendant," the lender misstated his monthly income in the loan, the lender "provided a loan for which he would be paying over 50% of his gross monthly income," and the lender "mistakenly assured him that he 'did not need to worry' about the loan being an adjustable rate mortgage because he 'should be able to refinance the loan.'"  Hughes, 2010 WL 4630227, at *7.  The plaintiff also cites High v. McLean Financial Corp., 659 F. Supp. 1561 (D.D.C. 1987).  There, the plaintiffs alleged that the defendant-lender assured them that there were "no problems" with their mortgage application.  Id. at 1570.  Later, another lending

institution whom the plaintiffs did not know would be involved in the loan application process informed the plaintiffs that it was denying their application.  Id.  The plaintiffs thereafter brought suit against the lender, alleging that it had negligently processed and reviewed the plaintiffs' loan application and negligently failed to inform them that another institution would decide whether to grant the plaintiffs' loan.  Id.  Denying the defendant's motion to dismiss, the court held that the plaintiffs stated a claim for negligence because "the defendant bank owed a duty to process a loan application with reasonable care when it had guaranteed the interest rate and the applicant had paid a loan processing fee."  Id.

The plaintiff relies on Hughes and High for the proposition that the defendant, by accepting the plaintiff's processing fee, undertook a "duty to non-negligently evaluate" the suitability of the loan for the plaintiff, presumably taking into account her personal financial circumstances.  Pl.'s Opp'n at 29.  Those cases do not support the imposition of such a broad duty on mortgage lenders and, even assuming that they did, this Court declines to impose such a duty here.  Hughes and High do, to be sure, stand for the proposition that a lender undertakes a duty to a borrower when its employees make certain assurances to the borrower during the loan negotiation process.  See Hughes, 2010 WL 4630227, at *7 (noting assurances made to borrower regarding suitability of adjustable rate mortgage); High, 659 F. Supp. at 1570 (noting that lender told borrowers there would be "no problem" with their loan application).  But the plaintiff does not allege that any assurances were made to her by the defendant or its employees.  Instead, the plaintiff has alleged that Mr. Cardwell, the mortgage broker, made misleading promises to her about the loan.  Compl. ¶ 47.  And there is no allegation that Mr. Cardwell was the defendant's employee or agent.  The Court, therefore, is not convinced that the purported duty advanced by the plaintiff has a legal basis.

The plaintiff also argues that the defendant's alleged violations of the CPPA constitute evidence of negligence.  Pl.'s Opp'n at 29-30.  The CPPA, however, provides an express private right of action for violations of the statute (under which the plaintiff has asserted claims that the Court has sustained against dismissal, see supra p. 15-16).  Since the statute creates an express and seemingly comprehensive right of action, the Court does not anticipate that the District of Columbia Court of Appeals would recognize a common law claim for violations of the CPPA. See Atwater v. Dist. of Columbia Dept. of Consumer & Reg. Affairs, 566 A.2d 462, 465 (D.C. 1989) ("The Consumer Protection Procedures Act is a comprehensive statute designed to provide procedures and remedies for a broad spectrum of practices which injure consumers"); cf. Johnson v. Sawyer, 47 F.3d 716, 729 (5th Cir. 1995) ("We can think of no reason for a Texas court to create a common law cause of action for [a] statutory violation" when "there is a comprehensive and express statutory private cause of action for the statutory violation.").  Thus, the Court will not permit the plaintiff to predicate negligence liability upon the defendant's alleged CPPA violations.

The plaintiff lastly contends that the defendant "violated its duty of care by failing to ensure that the Aapex brokered loan met industry standards."  Pl.'s Opp'n at 30.  She notes that Aapex had a publicly reported reputation of "illegal behavior" and that the company had been cited for wrongful lending practices by multiple states.  Id.  The plaintiff claims that the defendant "had a duty to exercise reasonable care toward its borrowers and breached that duty by continuing to partner with Aapex in the in the origination of [the] loan."  Id.  Yet, the plaintiff fails to cite any authority recognizing a mortgage lender's duty to avoid partnering with mortgage brokers of ill-repute, and the Court discerns no basis for imposing such a duty.  In short, the

plaintiff has failed to adequately allege a legal duty owed to her by the defendant and her

negligence claim must therefore be dismissed without prejudice.[4]

**E.      Count IX: Civil Conspiracy**

Count IX of the Complaint sets forth a claim of civil conspiracy against all defendants.

Compl. ¶¶ 199-204.  The elements of civil conspiracy are "(1) an agreement between two or

more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and

(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement

(4) pursuant to, and in furtherance of, the common scheme." Exec. Sandwich Shoppe v. Carr

Realty Corp., 749 A.2d 724, 738 (D.C. 2000) (quoting Griva v. Davison, 637 A.2d 830, 848

(D.C. 1994)).  In the District of Columbia, civil conspiracy is recognized not as an independent

tort but as a "means for establishing vicarious liability for [an] underlying tort." Id.  (quoting

Halberstam v. Welch, 705 F.2d 472, 479 (D.C. Cir. 1983)).  Consequently, "'civil conspiracy

depends on performance of some underlying tortious act.'" Id. (alteration omitted).

Because the Court has already dismissed the plaintiff's negligence claim, that claim

cannot serve as the "underlying tort" for her civil conspiracy claim.  The defendant suggests that

the plaintiff's negligence claim is the only "underlying tort" alleged in the Complaint that could

sustain her civil conspiracy claim.  Def.'s Mem. at 14.  The plaintiff, on the other hand, contends

that the defendants' alleged CPPA violations would be sufficient predicates for a civil conspiracy

claim.  Pl.'s Opp'n at 31.  The Court does not agree.  While it has not reached this conclusion, the

District of Columbia Court of Appeals has expressed skepticism about statutory violations

serving as "underlying torts" for civil conspiracy claims where the statutory right at issue has no

common law tort analogue.  See Exec. Sandwich Shoppe, 749 A.2d at 738 (directing trial court

---

[4] The Court dismisses this claim without prejudice because it is not inconceivable that the plaintiff could cure the
pleading deficiencies identified by the Court.

to consider on remand "authority which suggests that a claim of civil conspiracy does not lie for violation of a statute such as the [District of Columbia Human Rights Act]," and noting rejection of comparable civil conspiracy claim in <u>Monsanto v. Electronic Data Sys. Corp.</u>, 141 A.D.2d 514 (N.Y. App. Div. 1988), but declining to resolve the issue). In asserting that CPPA violations can serve as civil conspiracy predicates, the plaintiff notes that the CPPA represents a codification of the District of Columbia's common law unconscionability doctrine. Pl.'s Opp'n at 32. At common law, though, unconscionability was used as a defense in contract actions, not as a basis for obtaining damages in tort. <u>See</u> <u>Williams v. Cent. Money Co.</u>, 974 F. Supp. 22, 28 (D.D.C. 1997) ("The claim of common law unconscionability appears to apply only defensively, for example, as a response to an attempt to enforce a contract." (citing Restatement (Second) of Contracts § 208, cmt. g (1981))). Since the CPPA does not appear to have a common law tort analogue, this Court assumes that the District of Columbia Court of Appeals would not recognize a civil conspiracy claim based solely upon violations of the CPPA. Accordingly, the plaintiff's civil conspiracy claim must be dismissed without prejudice.[5]

**F.     Count X: Joint Venture**

Count X of the Complaint sets forth a claim for joint venture against all defendants. Compl. ¶¶ 205-11. CitiMortgage asserts that joint venture is not a recognized cause of action in the District of Columbia. Def.'s Mem. at 15. The plaintiff responds that she has adequately pleaded joint venture as a theory of liability under District of Columbia law. Pl.'s Opp'n at 35 (citing <u>Faison v. Nationwide Mortg. Corp.</u>, 839 F.2d 680 (D.C. Cir. 1987)). As the Court understands the plaintiff's argument, she is not asserting joint venture as an independent cause of action, but rather is seeking to hold the defendants jointly and severally liable for damages

---

[5] The Court dismisses the civil conspiracy claim without prejudice because it may be possible for the plaintiff to adequately re-plead her negligence claim, which could, in turn, serve as the underlying tort for her civil conspiracy claim.

resulting from misconduct that occurred in connection with an alleged "joint venture" of the defendants.  See Pl.'s Opp'n at 35.

The Circuit in Faison did refer to what appears to be a joint venture theory of liability under District of Columbia law, though it did not discuss the standards or elements for such a theory.  See Faison, 839 F.2d at 685 ("If any of the defendants in this case is found to be a party to a joint venture that caused tortious injury to plaintiffs, those joint venturers are also joint tortfeasors" (citing Stevens v. Hall, 391 A.2d 792, 794 (D.C. 1978))).  Nor does the District of Columbia Court of Appeals decision cited by the Faison court, Stevens v. Hall, set forth any standards for joint venture liability.  See Stevens, 391 A.2d at 794.  Nevertheless, assuming the plaintiff could pursue such a theory under District of Columbia law, it is clear that she would have to allege some underlying tortious conduct.  See Faison, 839 F.2d at 685.  And as explained in the context of the plaintiff's civil conspiracy claim, the plaintiff has failed to adequately allege an underlying tort against the defendant.   The plaintiff's claim for joint venture liability must therefore be dismissed without prejudice.[6]

## IV.  CONCLUSION

For the foregoing reasons, the Court concludes that the defendant's motion to dismiss must be granted as to the TILA claim for damages (Count VI), and the RESPA claim (Count VIII), and that those claims must be dismissed with prejudice.  The Court further concludes that the motion must be granted as to the negligence claim (Count IV), the civil conspiracy claim (Count IX), and the joint venture claim (Count X), and that those claims must be dismissed

---

[6] The Court dismisses the joint venture claim without prejudice because the plaintiff could possibly adequately re-plead her negligence claim.

without prejudice.  Finally, the Court finds that the defendant's motion must be denied as to the

TILA claim for rescission (Count VI), and the CPPA claims (Counts II and III).[7]

      **SO ORDERED** this 26th day of September, 2011.[8]

REGGIE B. WALTON<br>
United States District Judge

---

[7] The defendant has also moved, in the alternative, to strike the plaintiff's request for punitive damages under her negligence claim.  Def.'s Mem. at 16.  The Court need not consider this alternative request in light of its dismissal of the plaintiff's negligence claim.

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.